# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **MAGEN B NORWOOD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **2:14-CV-01826-KOB** |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant** | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On November 28, 2011,  the claimant, Magen Norwood, protectively applied for disability insurance benefits and supplemental security income under Title II and Title XVI of the Social Security Act. (R. 207). The claimant initially alleged in both applications disability commencing January 1, 2006 because of severe asthma, severe allergies, severe depression, anxiety, chronic pain, arthritis, and acid reflux. (R. 212).  The Commissioner denied the claims on April 6, 2012. (R. 96, 102).  The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on May 20, 2013. (R. 40, 111).

In a decision dated July 25, 2013, the ALJ found that the claimant was not disabled as defined by the Social Security Act and was ineligible for social security benefits. (R. 17-39).  On July 25, 2014, the Appeals Council denied the claimant's request for review. (R. 1). Consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1-3).  The claimant has exhausted her administrative remedies, and

1

this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  For the reasons stated below, this court AFFIRMS the decision of the Commissioner.

## II. ISSUES PRESENTED

The claimant presents the following issues for review:

1. whether the ALJ properly assessed the claimant's treating physician's opinion in determining the mental RFC findings;

2. whether substantial evidence supports the ALJ's physical RFC findings; and

3. whether the ALJ properly developed the record.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if she applied the correct legal standards and if substantial evidence supports the factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No...presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker,* 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo.* The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational

2

factors "are not medical opinions...but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker,* 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of the evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

### IV. LEGAL STANDARD

Under 42 U.S.C. §423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months...". 42 U.S.C. §423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

(1) Is the person presently unemployed?

    (2) Is the person's impairment severe?
    (3) Does the person's impairment meet or equal one of the specific impairments
    set forth in 20 C.F.R. pt. 404, subtpt. P, app. 1?
    (4) Is the person unable to perform his or her former occupation?
    (5) Is the person unable to perform any other work within the economy?

    An affirmative answer to any of the above questions leads either to the next
    question or, on steps three and five, to a finding of disability. A negative answer
    to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

    The ALJ must give treating physicians substantial weight, and may only credit the opinion of a consultative physician above that of a treating physician for good cause. *Crawford v. Commissioner*, 363 F.3d 1155, 1159 (11th Cir. 2004); *see also Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). "Good cause" for rejecting a treating physician's testimony may include occasions when such evidence is wholly conclusory, unaccompanied by objective medical evidence, or contradicted by other medical evidence. *Crawford*, 363 F.3d at 1159; *Jones v. Dept. of Health & Human Services*, 941 F.2d 1529, 1533 (11th Cir. 1991); *see also Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991).

    The RFC is a measure of what a claimant can do despite her credible limitations. *See* 20 C.F.R. § 404.1545. The ALJ must first identify the claimant's functional limitations and abilities on a function-by-function basis before he can express the RFC in terms of exertional levels. SSR 96-8p. When an ALJ  considers all the evidence, determines that the claimant is not disabled, and poses a hypothetical to a vocational expert that limits the claimant to a certain level of exertional activity, the ALJ has complied with the requirements of SSR 96-8p. *Freeman v. Barnhart,* 220 Fed. App'x 957, 960 (11th Cir.  2007).

Additionally, the ALJ has a duty to fully and fairly develop the record. *See Lucas v. Sullivan*, 918 F.2d 1567, 1573 (11th Cir. 1990). Under the current law, the ALJ is not obligated to recontact physicians if he finds the evidence to be inadequate. This action is now discretionary. *See* 20 C.F.R. § 404.1520b(c)(1) (stating that the ALJ "*may* [not must] recontact your treating physician, psychologist, or other medical source" to resolve inconsistencies or insufficiencies in the record) (emphasis added).

## V. FACTS

The claimant was 26 years old at the time of the ALJ's final decision. (R. 34). The claimant has a eighth-grade education and no past relevant work experience. (R. 34, 46). However, the claimant has work experience below the level of substantial gainful activity as a telemarketer, waitress, retail cashier, and packer. (R. 72-73, 230). At the hearing, the claimant stated that she was unable to work because of severe asthma, post traumatic stress disorder, depression, social anxiety with agoraphobia, anaphylactic shock, allergies, and lower back pain. (R. 47-61).

*Physical Impairments*

The claimant began receiving prenatal care at St. Vincent's East, Family Medicine in Birmingham, AL, on September 11, 2007. At the clinic, she reported a medical history of asthma, chronic coughing and wheezing, seasonal allergies, and also indicated that she smoked one pack of cigarettes a day. She stated that she was not taking medication for her asthma. The doctor at the clinic provided routine prenatal care, discussed smoking cessation and the risks of smoking while pregnant, and prescribed Proventil for the claimant's asthma. (R. 290-92).

On January 14, 2008, the claimant experienced an asthma exacerbation. The doctor at St.

Vincent's East, Family Medicine gave her samples of Symbicort for her asthma and discussed the importance of smoking cessation. The claimant returned one week later and stated that she was doing well with Symbicort and had no complaints. She reported that her shortness of breath was improved. The doctor told her to continue to use Symbicort and counseled her to stop smoking. (R. 285-86).

On January 14, 2009, the claimant presented to St. Vincent's East, Family Medicine with dermatitis or a rash of an unknown cause. (R. 272). On December 15, 2009, the claimant reported that she experienced multiple episodes of urticaria (hives). The treating doctor prescribed an EpiPen and referred her to Dr. William Massey, an internal medicine specialist, for skin testing. (R. 269).

On January 19, 2010, the claimant began to see Dr. Massey in consultation with her doctors from St. Vincent's East, Family Medicine. Dr. Massey performed lung function studies on the claimant and determined that her spirometry (inhalation) was normal; that her lung volumes were normal; and that her diffusion was slightly decreased. Dr. Massey performed an aeroallergen test that showed the claimant was allergic to tree mold, smuts, dust mites, and cat and dog dander. Dr. Massey believed the claimant should be on chronic antihistamine suppression because of her multiple episodes of urticaria, and that the most recent episode suggested anaphylaxis of unknown etiology. Dr. Massey diagnosed the claimant with asthma and chronic rhinitis. (R. 329-30).

The claimant received treatment for pharyngitis (sore throat) in January 2010. On February 9, 2010, the claimant returned to St. Vincent's East, Family Medicine, complaining of a sore throat. She stated that her throat was persistently swollen and mildly painful; that she could

6

not fall asleep because of her throat; and that she snored. The treating doctor prescribed Dexamethasone and referred her to Dr. C. Colvin Peyton, an ENT. (R. 265-268).

The claimant returned to St. Vincent's East, Family Medicine because of lower back pain on July 15, 2011. The treating doctor diagnosed the claimant with a paraspinal muscle spasm, low back pain, gastroesophageal reflux disease, and asthma. (R. 257).

On October 26, 2011, Dr. Massey diagnosed the claimant with chronic urticaria with some history of anaphylaxis and asthma. Dr. Massey noted that the claimant reported having recurrent hives, but was not taking any medication because she had run out. Dr. Massey prescribed the claimant Cetirizine for her chronic urticaria, a ProAir inhaler for asthma, and EpiPen for anaphylaxis. (R. 328).

Dr. Kennith McCollough treated the claimant for acute pharyngitis at St. Vincent's East, Family Medicine on November 29, 2011. On December 6, Dr. Marian Simms treated the claimant for asthma and gastroesophageal reflux disease. (R. 373-77).

On October 4, 2012, the claimant returned to St. Vincent's East, Family Medicine complaining of numbness and tingling. On that visit, the claimant also told Dr. Nathan Shepard that she had experienced lower back pain for several years.  Dr. Shepard provided a referral to an orthopedic specialist. Dr. Shepard diagnosed the claimant with paresthesias (tingling sensation), history of anaphylaxis, low back pain, and asthma. (R. 367-72).

On March 3, 2012, Marshall Kuremsky, M.D., an orthopedic surgeon, performed a consultative examination on the claimant at the request of the state Disability Determination Service. The claimant told Dr. Kuremsky that she suffered from psychiatric and pulmonary issues; that she has difficulty breathing when she does not take her medication; and that she has

smoked one pack of cigarettes a day for seven years. She reported eight to ten wheezes per month, which worsened with exercise. (R. 335-339).

Dr. Kuremsky noted that the claimant quit her job as a telemarketer in 2009 because she had problems breathing and communicating over the phone. Dr. Kuremsky also noted that the claimant stated that she could dress and feed herself; could stand at one time indefinitely; could walk on level ground up to 100 yards; could lift approximately fifty pounds; could drive, but did not have a license; and could sweep, mop, vacuum, and cook in short intervals.  He noted that if the claimant clearly had dyspnea on exertion, she may be a candidate for some type of stress test or pulmonary function type test. Dr. Kuremsky indicated that modifying her environmental risk factors and quitting tobacco may help in employment scenarios, and that, "psychiatric type issues, these might be better evaluated through disability." (R. 335-39).

*Mental Impairments*

The claimant received a diagnosis of post-partum depression in March 2008. (R. 279). The doctors at St. Vincent's East, Family Medicine prescribed the claimant Paxil for depression. On July 24, 2008, a doctor raised the prescribed dose of Paxil. (R. 276). On January 14, 2009, the claimant told her doctor that she had stopped taking Paxil because the medication made her depression worse. The doctor referred her to a psychiatrist. (R. 272).

The claimant began psychiatric treatment at Capital Care Comprehensive Behavioral Health Program on January 31, 2012. On February 29, 2012, she began therapy sessions with a psychiatrist, Graham Osula, M.D. Dr. Osula diagnosed the claimant with major depressive disorder chronic recurrent without psychosis, post traumatic stress disorder, and agoraphobia with panic disorder. Dr. Osula prescribed Trazodone for insomnia; Klonopin for anxiety; and

Wellbutrin for depression, smoking cessation, and to improve poor concentration. (R. 380-81).

On March 3, 2012, Dr. Marshall Kuremsky performed a consultative examination on the claimant at the request of the State Disability Determination Service. The claimant alleged depression, anxiety, chronic pain, urticaria, and asthma. The claimant told Dr. Kuremsky that she had a therapist that worked with her and helped with her depression, anxiety, and chronic pain. Dr. Kuremsky described the claimant as, "an alert and oriented and pleasant girl, in no acute distress," who appeared to be "a bit anxious." (R. 335-39).

On March 28, 2012, Dr. Osula adjusted the claimant's medication because she felt "psychotic." (R. 392-93). On April 23, Dr. Osula again adjusted the claimant's medication to better treat her anxiety. (R. 403). On June 20, the claimant told Dr. Osula that she had lost her medication, decompensated, cut her wrists, and had been admitted to the hospital.  Dr. Osula prescribed the claimant Celexa for depression; Klonopin for anxiety; Trazodone and Ambien for insomnia; and Abilify to improve her mood. (R. 413). On September 17, Dr. Osula  prescribed Adderall for ADD and Topomax for improved mood and appetite. (R. 423). On January 26, 2013, the claimant told Dr. Osula that she had run out of her medication three weeks early. Dr. Osula contacted the pharmacy and discovered that the claimant had been filling her prescriptions early. Dr. Osula gave the claimant a one-month prescription with the understanding that she would not fill prescriptions early again. (R. 438).

On May 8, 2013, Dr. Osula completed a supplemental questionnaire at the request of the plaintiff's attorney. Dr. Osula reported that the claimant had a moderate restriction on activities of daily living; marked deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner; a marked impairment of the ability to respond to

9

customary work pressures; marked impairments on ability to understand, carry out, and remember work instructions; and marked impairments on the ability to respond appropriately in a work setting. Dr. Osula further noted that the claimant had moderate impairments in the ability to respond appropriately to co-workers, and to perform both simple and repetitive tasks in a work setting. Finally, Dr. Osula noted that these impairments had lasted or were expected to last twelve months or longer. (R. 483-84).

*ALJ Hearing*

After the Commissioner denied the claimant's request for disability insured benefits and supplemental security income benefits, the claimant requested and received a hearing before an ALJ. (R. 40).   At the hearing, the claimant testified that she attended school until the eighth grade, but was in special education classes during that time. She testified that she has not received a GED. The claimant stated that she last worked as a telemarketer, but quit because her breathing was bad and she could not speak in long sentences. (R. 46-47).

The claimant stated that her asthma was the largest problem and that people at work had smoked around her. The claimant described Dr. Gonzalez as her primary doctor, but that she sees a different doctor every time she visits the "practice" to receive her medications. (R. 65). The claimant stated that she was taking Albuterol, a nebulizer, and an inhaler to treat her asthma. She testified that she used her nebulizer once a day, at night, because it made her shake for an hour after she used it. (R. 69). The claimant stated that she had been to the emergency room because of her asthma in the past but could usually control her symptoms at home. She testified that her asthma is the major reason she is not working. (R. 47-49).

The claimant testified that she suffers from post traumatic stress syndrome (PTSD)

because she was sexually abused in a previous relationship. She explained that her PTSD affected her work, her outlook on life, and her interactions with people. (R. 50-51).

The claimant stated that she lives with her mother but that they do not get along. She stated that she normally stayed at home, and would cook, clean, and take care of her children. She stated that she can do laundry, sweep, and vacuum. She noted that she helped her daughter prepare for school in the mornings and took care of her son during the day. She indicated that she does not have a driver's license and does not drive. She stated that she does not go to the grocery store because she has social anxiety. (R. 51-57).

The claimant stated that she was diagnosed with agoraphobia and that it is "pretty bad." She testified that she has emotional problems with people, cannot make eye contact, and cannot go into big stores. However, she stated that she was baptized at a local church in front of a large number of people because she wanted to be baptized with her children. She stated that she did not attend church regularly because it brings her anxiety. (R. 57-58). She testified that she is prescribed Clonazepam for her social anxiety. (R. 61). She stated that her anxiety also affects her relationships with the people she knows. The claimant's attorney asked if she could perform a job that had a regular forty-hour work week, eight hours a day; that did not involve being around a lot of people; and that had occasional supervisor contact. She stated that she did not believe she could perform the hypothetical work. (R. 59).

The claimant testified that she suffers from depression and has had close loved ones pass away in the past. The claimant stated that she had difficulty sleeping because of her depression and generally slept only two hours a night. The claimant testified that her therapist had given her Trazadone and Ambien to help her sleep; however, she often did not take it because she could

not get up the next morning. (R. 52-62).

The claimant stated that she suffers from anaphylactic shocks. She explained that this ailment starts with a headache and stomachache, ends in sudden hives and swollen hands, and is "worse than a bee sting." The claimant stated that she takes Zyrtec and has an EpiPen for her condition. She stated that medical tests have not indicated what triggers her anaphylaxis. (R. 59-62).

The claimant testified that Dr. Osula and Dr. Marian Smith treat her for her mental conditions. She stated that she talks with Dr. Smith to express her feelings because Dr. Smith is a woman. She described her conversations with Dr. Osula as "not too deep," and that she would speak to him a little bit, but Dr. Smith would generally talk to him. She stated that Dr. Osula would then write her medications. The claimant indicated that she last saw Dr. Osula and Dr. Smith on February 27, 2013. (R. 64).

The ALJ asked the claimant about her history with Dr. Slappey. The claimant stated that she saw Dr. Slappey a couple of times because she had fallen and bruised her spine. She indicated that she needed to return to Dr. Slappey, because when she stands for ten minutes her back troubles her. The claimant testified that Dr. Slappey had prescribed hydrocodone for back pain. She stated that she had previously visited the emergency room because of her back. (R. 61-64).

The ALJ asked the claimant about the amount of physical activity she could perform. The claimant stated that she could sit for ten minutes; could only walk "to the mailbox and back," without aggravating her symptoms; and could only lift and carry a half gallon of milk without aggravating her situation. (R. 66).

12

The ALJ asked the claimant about her prior work history. The claimant testified that she "caught hot plastic, and put it in boxes" at Sterilite. She stated she performed this job for two weeks, but quit because she could not stand for the required length of time and the hot air made it difficult to breathe. She stated that she had worked as a cashier at a convenience store, and that she opened the store, ran the cash register, and counted money.  She stated that she had also previously worked as a waitress. (R. 67-68).

The claimant stated that she had not worked for pay since 2009. She testified that she has received income from "family assistance," in the past, but that she no longer received it. She stated that she receives Food Stamps, is on Medicaid, and that her children do not receive any other separate sources of income. She stated that her sister drives her to her therapist's office. The claimant also stated that she smokes one half pack of cigarettes a day. (R. 69-71).

A vocational expert, Mary House Kessler, Ph.D., testified on the classification of the claimant's past work and the ability of someone with the claimant's limitations to perform that work or other work.  Dr. Kessler indicated that the claimant's past work as a waitress was light, semi-skilled work, but did not transfer to other types of work; telemarketer was sedentary, semi-skilled work; retail cashier was light, semi-skilled work; and packer was medium, unskilled work. (R.72-73).

The ALJ then asked Dr. Kessler to assume that the claimant was a younger individual with a limited education and no past relevant work experience, and could perform medium work with the following limitations: should primarily work with or around things as opposed to the general public; could occasionally stoop and crouch; could not drive; and should work in a climate controlled environment.  Dr. Kessler provided examples of jobs that an individual with

those limitations could perform: assembly worker, with 7,800 jobs in Alabama and 149,600 nationally; food preparation worker, with 2,500 jobs in Alabama and 173,400 nationally; and packer, with 1,900 jobs in Alabama and 208,300 nationally. Dr. Kessler stated that a person performing any of these jobs would only need to have contact with coworkers or supervisors occasionally. She added that these employers would tolerate no more than one-and-a-half days of absenteeism per month. (R. 74-78).

The ALJ then asked Dr. Kessler if any light, unskilled work opportunities existed that an individual with the claimant's limitations could perform. Dr. Kessler gave examples: inspector and tester, with 2,300 jobs in Alabama and 130,200 nationally; assembler and production worker, with 6,200 jobs in Alabama and 89,800 nationally; and food preparation worker, with 1,300 jobs in Alabama and 170,600 nationally. Dr. Kessler testified that these examples of work, at the medium and light exertional level, were representative of jobs the claimant could physically perform as described. However, Dr. Kessler found that, as to past employment, the claimant could only return to the job of packer because the other jobs involved working with people and the general public. (R. 75).

Next, the ALJ asked Dr. Kessler to assume that the claimant was limited to the original hypothetical of medium work, but could stand, walk, or sit for only ten minutes at a time. Dr. Kessler stated, "at the medium level, it is very rare for anyone to be allowed to sit during the workday"; therefore, Dr. Kessler indicated that the claimant would be unable to perform the jobs of packer, assembler, or food preparation worker. Dr. Kessler stated that the limitation on standing and walking would prevent the claimant from performing light work as well because most jobs would require at least two hours before a break could be taken. Dr. Kessler stated that

the jobs she described were simple, repetitive, and involved non-complex tasks. (R. 75-77).

*The ALJ's Decision*

On July 25, 2013, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. (R. 36). First, the ALJ found that the claimant met the insured status requirements of the Social Security Act through June 30, 2007, and had not engaged in substantial gainful activity since January 1, 2006, the alleged onset date of disability. (R. 23).

Next, the ALJ found that the claimant had severe impairments of major depressive disorder, post traumatic stress disorder, panic disorder with agoraphobia, asthma, chronic urticaria with some history of anaphylaxis, and obesity. The ALJ further noted the existence of non-severe impairments: injuries to the left shoulder and right knee, episodes of nephrolithiasis, pharyngitis, gastroesophageal reflux disease or gastritis, transaminitis (liver damage), parestheisas, and lower back pain. The ALJ added that although he found these impairments to be non-severe, he considered the impairments in assessing the claimant's RFC. The ALJ determined that the claimant's alleged chronic pain and arthritis were not medically determinable impairments because the claimant's medical records did not indicate any diagnoses of the alleged impairments. (R. 23-27).

Further, the ALJ noted that the claimant's severe and non-severe impairments did not, singly or in combination, meet or medically equal the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). (R. 27). In making this finding, the ALJ considered the relevant listings corresponding to the claimant's severe impairments.  The ALJ found no medical evidence within the record that documented listing-level severity, either individually or in

combination. (R. 15).

The ALJ found that the severity of the claimant's mental impairments, considered singly

and in combination, do not meet or equal the criteria of sections 12.04 and 12.06. The ALJ

considered whether the claimant met the "Paragraph B" criteria that require marked limitations in

two out of three specified areas. First, the ALJ determined that the claimant had no more than a

mild restriction in activities of daily living because of her mental impairments. The ALJ cited the

claimant's function report that indicated that she was able to get her daughter off to school and

take care of her son throughout the day. Further, the ALJ noted that the claimant stated she had

no problem with personal care; could prepare meals daily; could pick up the house, fold clothes,

and read; and could sweep, mop, vacuum, and cook in short intervals. The ALJ found this

evidence supported no more than a mild restriction on activities of daily living. (R. 28).

The ALJ determined the claimant suffered no more than a moderate difficulty in social

functioning. The ALJ cited the claimant's function report, which stated she had no problems

getting along with family, friends, neighbors, or others. The ALJ found that, regarding

concentration, persistence, or pace, the claimant had no more than mild difficulties because of

her mental impairments. The ALJ noted that the claimant stated that reading was her hobby and

interest, and that she could pay bills and count change. She reported that she could pay attention

for a long time; could finish what she started; and could follow both written and verbal

instructions well. Finally, the ALJ noted that the claimant had not experienced an episode of

decompensation that lasted for an extended duration. Therefore, the ALJ found the "paragraph

B" criteria were not satisfied because the claimant had not experienced at least two marked

limitations. (R. 27-28).

The ALJ found that the claimant had the RFC to perform "medium" work as defined in 20 C.F.R. 404.1567(c) and 416.967(c), with the following limitations: should primarily work with or around things as opposed to working with the general public; could occasionally stoop and crouch; could not drive; should work in a climate controlled environment; should be limited to simple, repetitive, non-complex tasks; and could only have occasional contact or be in close proximity on an occasional basis with coworkers or supervisors. (R. 29).

In making this finding, the ALJ considered the claimant's symptoms and corresponding medical record. The ALJ reviewed the claimant's subjective complaints in accordance with Social Security Ruling 96-7p. The ALJ also considered controlling case law from the Eleventh Circuit standard to assess the subjective complaints of pain and other subjective symptoms.

The ALJ examined the claimant's alleged disability caused by her asthma. He found that none of the physicians that treated her at St. Vincent's East, Family Medicine had reported that she had disabling symptoms of asthma. Further, the ALJ noted that the claimant's asthma had been described as no more than mild or moderate. The ALJ also noted that the claimant had not reported disabling levels of symptoms to the physicians that treated her asthma. The ALJ stated that he considered the claimant's asthma in the RFC.

The ALJ determined that the evidence did not establish the presence of disabling limitations from the claimant's recurrent hives. The ALJ noted that the objective medical evidence indicated only one specific episode of anaphylaxis. Although the claimant suffered from recurrent hives, the ALJ noted that she reported to Dr. Massey in October 2011 that she had been out of her medication and was not taking anything. The ALJ stated that the claimant's chronic urticaria with some history of anaphylaxis had been taken into consideration in the RFC

17

determination. (R. 31).

Next, the ALJ noted that the claimant's St. Vincent's East, Family Medicine records indicated occasional complaints of depression and a referral to a psychiatrist. However, the ALJ found that the physicians at St. Vincent's did not report an anxiety disorder or that the claimant had disabling mental impairments. (R. 31).

The ALJ gave little weight to Dr. Osula's opinion in a supplemental questionnaire that he completed at the request of the claimant's attorney in May, 2013.  The ALJ stated that Dr. Osula's treating medical records did not indicate disabling mental limitations. First, the ALJ noted that no evidence existed that the claimant's medication was ineffective. The ALJ found significant that the claimant had lost her medication before the single time she decompensated. The ALJ also found significance in Dr. Osula's report on January 26, 2013, that the claimant was filling her prescriptions early and had run out of her medication. The ALJ stated that, in Dr. Osula's supplemental questionnaire, Dr. Osula indicated that he was unsure if the levels of severity described would apply without consideration of substance abuse. However, the ALJ noted that no evidence existed that the claimant had been diagnosed with substance abuse. Finally, the ALJ determined that Dr. Osula's treating medical records do not indicate marked mental limitations and, therefore, the ALJ afforded Dr. Osula's opinion in the supplemental questionnaire little weight. (R. 31-32).

The ALJ also determined that the claimant's daily activities were not consistent with the disabling physical or mental limitations she alleged. For example, the ALJ noted that, at the hearing, the claimant testified she could sit for only 10 minutes, walk only a short distance, and lift and carry only one-half gallon of milk. However, the ALJ cited Dr. Kuremsky's report that

18

stated the claimant indicated she could stand at one time indefinitely and lift approximately 50 pounds. The ALJ specifically found the claimant's testimony that she could not sit for more than ten minutes or lift and carry greater than one half gallon of milk were not credible. The ALJ determined that the claimant's statements to Dr. Kuremsky undermined the claimant's contention of disabling psychiatric-based limitations. (R. 32-33).

The ALJ then determined that while the claimant had alleged back pain, she did not have a "severe" back impairment. The ALJ noted that the claimant's back pain was inconsistently reported throughout her medical record. The medical evidence did not support the claimant's allegations of significant functional limitations related to a back impairment. Therefore, the ALJ determined that the claimant did not have more than minimal functional limitations or restrictions related to a back impairment for any period of twelve continuous months. (R. 33).

The ALJ then examined the claimant's obesity and accompanying impairments in accordance with Social Security Ruling 02-1p. He acknowledged that the record indicated that the claimant was obese, but that the claimant had not alleged limitations caused by her obesity. Further, no treating or examining physician had placed any restrictions on the claimant based on her obesity. Therefore, the ALJ determined that the claimant's obesity did not significantly interfere with her ability to perform physical activities or routine movements consistent with the exertional requirements of the RFC. (R. 33).

The ALJ only gave some weight to the non-examining state agency psychiatrist Dr. Robert Estock because he did not have access to all of the evidence at the time he developed his opinion. The ALJ afforded no weight to the disability examiner Meagan McDaniel because she was not a physician. (R. 34).

The ALJ found that the claimant was unable to perform any past relevant work. In making this determination, the ALJ relied on the testimony of the vocational expert at the ALJ hearing.  The vocational expert testified that the claimant's past work was performed at the sedentary to medium level of physical exertion and was unskilled to semi-skilled work. The vocational expert stated that a hypothetical person with the claimant's age, education, work experience, and residual functional capacity would be able to perform her past work as a packer; however, because this work was not performed at the substantial gainful activity level, the ALJ determined that it was not past relevant work. Thus, the ALJ concluded the claimant could not perform any past relevant work. However, the ALJ found that considering the claimant's age, education, work experience, and residual functional capacity, jobs exist in significant numbers in the national economy that the claimant can perform. Therefore, the ALJ determined that the claimant was not disabled. (R. 34).

## VI. DISCUSSION

The claimant argues that the ALJ's mental and physical RFC findings were not based on substantial evidence, and that the ALJ failed to develop the record. To the contrary, as discussed below, this court finds that the ALJ properly considered all the relevant evidence in determining the claimant's RFC. The ALJ applied the appropriate legal standards in his evaluation of the opinions of the physicians and the record as a whole, and substantial evidence supports the ALJ's findings.

*Issue 1: The ALJ's Mental Residual Functional Capacity Assessment*

The claimant argues that the ALJ failed to accord proper weight to the opinion of the claimant's treating physician, Dr. Osula. This court finds that the ALJ properly articulated his

reasons for giving little weight to the opinion of Dr. Osula and that substantial evidence supported these reasons.

The opinion of a treating physician "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Crawford*, 363 F.3d at 1159. Good cause exists when (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's medical records. *Id*. As discussed below, all three instances are present in this case; thus, the ALJ had good cause to discount Dr. Osula's opinion.

First, the evidence does not bolster Dr. Osula's opinion; rather, it supports a contrary finding.  As the ALJ noted, the claimant only occasionally complained of depression while receiving treatment at St. Vincent's East, Family Medicine since 2007. Further, the physicians at St. Vincent's did not record any history of the claimant's alleged anxiety disorder, and did not indicate any disabling mental limitations. The ALJ found significant that the claimant's sole decompensation episode occurred when she had lost her medication, and was filling her prescriptions early. This court agrees. In fact, no evidence exists that shows that the claimant's medications were ineffective.

The claimant's function report further undermines Dr. Osula's opinion. For example, Dr. Osula indicated that the claimant had difficulty in maintaining social functioning. However, the claimant indicated in her function report that she had no problems getting along with family, friends, neighbors, or others. Further, although Dr. Osula stated that the claimant had marked deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner, the evidence does not support this opinion. In fact, the claimant indicated in

21

her function report that reading was her hobby and interest; that she could pay attention for a long time; and that she could finish what she started. Thus, the claimant's own statements support a finding contrary to the opinion of the treating physician.

Finally, Dr. Osula's opinion was conclusory, or at least inconsistent with his own medical records. The supplemental questionnaire only contains the treating physician's conclusions. For example, Dr. Osula indicated that the claimant suffered from several marked impairments, but declined to provide any explanation of how he arrived at this conclusion. The ALJ explained, and this court agrees, that the treating physician's treatment notes do not correspond to the degree of limitations suggested. As the ALJ indicated, the treating physician was unsure if the levels of severity he described would apply without consideration of substance abuse. (R. 32, 484). However, the medical record contains no evidence of substance abuse. Therefore, the supplemental questionnaire was conclusory and inconsistent with Dr. Osula's treating medical records.

In sum, the ALJ showed good cause for not giving the treating physician's opinion substantial weight. Therefore, the ALJ applied the proper legal standard and substantial evidence supports the ALJ's decision to give Dr. Osula's opinion little weight.

*Issue 2: The ALJ's Physical Residual Function Capacity Assessment*

The claimant argues that substantial evidence does not support the ALJ's RFC for medium work, limited to occasional stooping and crouching. The court concludes that substantial evidence supports the ALJ's assessment.

The claimant argues that the ALJ failed to provide a function-by-function analysis of the claimant's abilities in developing the RFC. This court finds that the ALJ thoroughly considered

all of the evidence. For example, the ALJ discussed each of the claimant's severe and non-severe impairments and considered each impairment in developing the RFC. The ALJ determined that this evidence did not support the claimant's alleged level of disability. The ALJ noted that the claimant's medical records describe her asthma as no more than mild or moderate, and that she continued to smoke despite her alleged symptoms. The ALJ also noted that Dr. Massey reported that the claimant's spirometry was normal, and that Dr. Kuremsky examined the claimant and stated that her lungs were clear to auscultation bilaterally. (R. 31).

The claimant also argues that the ALJ did not properly assess the impact of obesity in the development of the RFC. However, the ALJ stated that, "I have evaluated the claimant's obesity and accompanying impairments in accordance with Social Security Ruling 02-1p." (R. 33). The ALJ noted that no treating or examining physician had placed any restrictions on the claimant related to obesity. Moreover, the claimant herself had not alleged any limitations because of her obesity. This court finds that the claimant's daily activities do not support the level of limitations she attributes to obesity, singly or in combination with her other impairments.

 Finally, at the hearing, the ALJ proposed a hypothetical individual with the claimant's abilities and reduced RFC of medium work that included limitations of occasional stooping and crouching. The vocational expert testified that jobs existed in the national economy that the hypothetical individual could perform. Therefore, this court finds that the ALJ applied the proper legal standard and substantial evidence supports the ALJ's physical RFC assessment.

### Issue 3:  Whether the ALJ Properly Developed the Record

Finally, the claimant argues that  substantial evidence does not support the ALJ's RFC determination because it was not based on a physician's opinion. The claimant argues that the

ALJ could have obtained a medical source opinion (MSO), by further consultative examination. However, issues such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions...but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case." 20 C.F.R. §§ 404.1527(d), 416.927(d). An ALJ is not required to order additional consultative examinations. *See* 20 C.F.R. § 404.1520b(c)(1). In this case, the ALJ  found sufficient evidence in the record to make a determination on the claimant's RFC. The record contained a thorough medical history of the claimant's alleged impairments. Further, the ALJ considered the claimant's own testimony in determining the claimant's RFC. The record contains substantial evidence to support the ALJ's determination; therefore, the ALJ did not fail to develop the record.

## VII. CONCLUSION

For the reasons stated above, this court concludes that the ALJ applied the proper legal standard and substantial evidence supports the Commissioner's decision. Accordingly, this court AFFIRMS the decision of the Commissioner. The court will enter a separate Order to that effect simultaneously.

DONE and ORDERED this 16th day of February, 2016.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE